1
2
3
4
5

CROSNER LEGAL, P.C.
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Jennifer L. MacPherson (SBN 202021)
jmacpherson@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

6

*Attorneys for Plaintiffs*

7

8

## UNITED STATES DISTRICT COURT

9

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

## EASTERN DIVISION

11

12
13

SHERI TUCKER and JANA RABINOWITZ, individually and on behalf of all others similarly situated,

Case No.: 24-cv-7911

**CLASS ACTION COMPLAINT**

14
15

Plaintiffs,

v.

JURY TRIAL DEMANDED

16
17
18

THE HONEY POT COMPANY, LLC,

Defendant.

19
20
21
22
23
24
25
26
27
28

Plaintiff Sheri Tucker ("Plaintiff Tucker") and Jana Rabinowitz ("Plaintiff Rabinowitz") (together, "Plaintiffs") bring this action against Defendant The Honey Pot Company, LLC ("Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to Plaintiffs' acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiffs' attorneys as follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. Defendant sells hundreds of thousands of the Products at issue to consumers throughout the United States.

2.      This Court has personal jurisdiction because Defendant**'s** contacts with the forum are continuous and substantial, and Defendant intentionally availed itself of the markets within California through its sales of The Honey Pot products at issue to consumers in California, including Plaintiff.

3.      Venue is proper in this district because Plaintiff Tucker resides in the Northern District of California and purchased Products at issue in this judicial district.

## II.   THE PARTIES

4.      Plaintiff Tucker resides in Alameda County. Plaintiff Tucker purchased one or more of Defendant's Products (as defined below) while in California. Plaintiff has purchased the following Products in California: (1) The Honey Pot "plant-derived" Organic Herbal Moisturizing Lubricant organic strawberry flavor on July 12, 2023 from amazon.com; (2) The Honey Pot "plant-derived" 100% Organic Cotton herbal-infused regular Pads with Wings on July 12, 2023 from amazon.com; and (3) The Honey Pot "plant-derived" 100% Organic Cotton Cover Overnight Pads with Wings on July 12, 2023 from amazon.com. In making the purchases, Plaintiff Tucker relied on the Plant-Derived Representations printed on the Products' label and packaging. At the time of the purchases, Plaintiff Tucker did not know that the Plant-Derived Representations were false. Plaintiff Tucker would not have purchased the Products, or at least would have paid less, had she

known they contained synthetic ingredients that are not derived from plants. Plaintiff Tucker continues to see the Products available for purchase and desires to purchase them again if the Plant-Derived Representations were true. Plaintiff Tucker is, and continues to be, unable to rely on the truth of the Products' Plant-Derived Representations.

5.      Plaintiff Rabinowitz resides in Nassau County in the State of New York. Plaintiff Rabinowitz purchased one or more of Defendant's Products including The Honey Pot "Sensitive Wash" and "Prebiotic Wipes" in New York during the class period. In making the purchases, Plaintiff Rabinowitz relied on the Plant-Derived Representations printed on the Products' label and packaging. At the time of the purchase, Plaintiff Rabinowitz did not know that the Plant-Derived Representations were false. Plaintiff Rabinowitz would not have purchased the Products, or at least would have paid less, had she known they contained synthetic ingredients that are not derived from plants. Plaintiff Rabinowitz continues to see the Products available for purchase and desires to purchase them again if the Plant-Derived Representations were true. Plaintiff Rabinowitz is, and continues to be, unable to rely on the truth of the Products' Plant-Derived Representations.

6.      Defendant manufactured, advertised, and sold the Products at issue in this judicial district. The deceptive Plant-Derived Representations on the Products were designed by Defendant to increase sales of the Products and obtain an advantage over Defendant's competitors that do not use such misleading claims. Defendant claims the Products are specifically designed to contain "The first complete feminine care system powered by herbs®." Defendant claims the Products are "plant-derived cause it's what your vagina deserves." Defendant utilizes a blog on its website to further reinforce the "plant-derived" promise. These extra label materials are useful in showing Defendant's intent behind the Plant-Derived claim. For example, the website states "***Natural*** Remedies for Relief."[1]

---

[1] https://thehoneypot.co/blogs/education/vaginal-dryness-natural-remedies

### III.    NATURE OF THE ACTION

7.    In an effort to increase profits and to gain an unfair advantage over lawfully acting competitors, Defendant falsely and misleadingly labels the Products with the following claims: "plant-derived" ("Plant-Derived Representations").

8.    In light of the Plant-Derived Representations, reasonable consumers, including Plaintiffs, believe the Products only contain ingredients that come from plants and/or from plants and minerals and that are not subject to chemical modification or processing, which materially alters the ingredients' original plant-derived composition. As such, reasonable consumers, including Plaintiffs, believe the Products only contain natural ingredients.

9.    However, contrary to the labeling, the Products contain numerous ingredients that do not come from plants or minerals whatsoever. In addition to those ingredients that have nothing to do with plants, the Products contain numerous ingredients that have been subjected to chemical modification or processing, which materially alters the ingredients' original plant-derived composition. [2] Put differently, to create certain ingredients used in the Products, plant-sourced ingredients are used but are then subjected to substantial chemical modification and processing such that the resulting ingredient used in the Products is an entirely new, synthetically created ingredient - one that is vastly and fundamentally different from the original plant-sourced ingredient. As such, the Plant-Derived Representations are misleading and deceiving and therefore unlawful.

10.    As a result, Plaintiffs bring this action individually and on behalf of those similarly situated to represent a National Class, a California Class, and a New York Class (defined below). Plaintiffs seek injunctive relief to stop Defendant's unlawful labeling and advertising of the Products, as Plaintiffs' primary litigation objective is to enjoin Defendant's unlawful labeling practices for the National Class, California Class, and New York Class.

---

[2] *See, e.g.,* 7 U.S.C. § 6502 (21): "The term 'synthetic' means a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal or mineral sources[.]"

## IV.    FACTUAL ALLEGATIONS

### A. Background

11.    Companies like Defendant use "green" type advertising to sell a variety of products for billions[3] of dollars especially in the cosmetic market. Consumers value these "green" natural products for several reasons, including the perceived benefits of avoiding synthetic and chemical ingredients and for generally helping the environment.

12.    In response to consumers' desire for plant-based products, Defendant sells purportedly "plant-derived" products in an effort to gain market share. Unfortunately, rather than creating the plant-derived products consumers desire, Defendant has chosen instead to market the Products through deceptive labeling and advertising in order to convince consumers the Products are plant-derived when, in reality, they contain non-plant derived, synthetic, and highly processed ingredients.

13.    In response companies green washing their products, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.[4] The FTC states: "Marketers, nevertheless, are responsible for substantiating consumers' reasonable understanding of 'biobased,' and other similar claims, such as 'plant-based,' in the context of their advertisements."[5]

14.    As a result of the Plant-Derived Representations, reasonable consumers, including Plaintiffs, believe the Products do not contain synthetically made chemicals. Given the Products' numerous synthetic ingredients, the Products' labeling is misleading and deceptive.

### B. The Products' Misleading and Deceptive Labeling

15.    Defendant manufactures, markets, promotes, advertises, labels, packages, and sells

---

[3] *See* https://www.forbes.com/sites/kristinlarson/2021/04/30/vegan-beauty--brands-like-typology-the-ordinary-luneaster-lead-the-way/?sh=2204efe62e0a. Last visited on April 8, 2022.; *See also* https://beautybusinessjournal.com/vegan-cosmetics-market/. Last visited on April 8, 2022.

[4] 16 C.F.R. § 260 – Guides for the Use of Environmental Marketing Claims, available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf

[5] [5]*Id.* at p. 246 (emphasis added).

a variety of personal and/or skincare and cosmetic products.

16.    As described herein, Defendant falsely and misleadingly labels the Products with the Plant-Derived Representations. Defendant reinforces the Plant-Derived Representation on each Product with the phrases "plant-derived," as well as displaying images of plants, including flowers.

17.    The following images depict the Products under Defendant's brand name and include a list of the synthetic and/or non-plant-derived ingredients. The following products are collectively referred to as the "Products":

### 100% Organic Cotton Cover Incontinence Products[6]

(Overnight, Liners, Daytime)

("Herbal-Infused and "Non-Herbal")



18.    The 100% Cotton Cover Incontinence (Overnight, Liners, and Daytime) "Herbal-

---

[6] For 100% Organic Cotton Cover Incontinence Products an exemplar label is provided. Other versions of the 100% Organic Cotton Cover Incontinence Products are materially the same and contain the same placement (front label) of the "Plant-derived" claim at issue. The size/absorbency variations here and for all 100% Organic Cotton Cover Incontinence Products contain the same "plant-derived" representations and synthetic ingredients. Further, each variety of the 100% Organic Cotton Cover Incontinence Products come in an "herbal-infused" and "non-herbal" version. The synthetic ingredients at issue are the same.

Infused" and "Non-Herbal" contain the following synthetic, non-plant derived ingredients: sodium polyacrylate, polypropylene, sodium polyacrylate, hotmelt glue, polyethylene, polyethylene terephthalate.

### 100% Organic Cotton Cover Liners[7]

(Everyday, Regular, Super, Overnight)

("Herbal-Infused and "Non-Herbal")



---

[7] For 100% Organic Cotton Cover Liner Products an exemplar label is provided. Other versions of the 100% Organic Cotton Cover Liner Products are materially the same and contain the same placement (front label) of the "Plant-derived" claim at issue. The size/absorbency variations here and for all 100% Organic Cotton Cover Liner Products contain the same "plant-derived" representations and synthetic ingredients. Further, each variety of the 100% Organic Cotton Cover Liner Products come in an "herbal-infused" and "non-herbal" version. The synthetic ingredients at issue are the same.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15  19.    The 100% Cotton Cover Liners contain the following synthetic, non-plant derived
16  ingredients: Sodium polyacrylate, polyethylene, hotmelt glue.

17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

1

**<u>100% Organic Cotton Cover Heavy Flow Liners</u>**



20.    The 100% Cotton Cover Heavy Flow Liners contain the following synthetic, non-plant derived ingredients: polypropylene, sodium polyacrylate, polyethylene, hotmelt glue, and polyethylene terephthalate.

**100% Organic Cotton Cover Pads with Wings[8]**

(Regular, Super, Overnight)

("Herbal-Infused and "Non-Herbal)



---

[8] For 100% Organic Cotton Cover Pads with Wings Products an exemplar label is provided. Other versions of the 100% Organic Cotton Cover Liner Products are materially the same and contain the same placement (front label) of the "Plant-derived" claim at issue. The size/absorbency variations here and for all 100% Organic Cotton Cover Pads with Wings Products contain the same "plant-derived" representations and synthetic ingredients. Further, each variety of the 100% Organic Cotton Cover Pads with Wings Products come in an "herbal-infused" and "non-herbal" version. The synthetic ingredients at issue are the same.

CLASS ACTION COMPLAINT

THE FUTURE OF
PERSONAL WELLNESS™

MADE BY HUMANS WITH VAGINAS,
FOR HUMANS WITH VAGINAS™

We're formulating a more transparent world rooted
in holistic solutions for total wellness. A world where
the power of herbs meets the efficacy of science
and inspires accessible self-care rituals for intimate
health. Clinically-tested formulas and plant-derived
ingredients designed to give you a good day
and even better tomorrow.

BUILD A MORE HOLISTIC VAGINAL
WELLNESS ROUTINE WITH OUR
OTHER PRODUCTS:

• ORGANIC COTTON TAMPONS
• HERBAL LINERS + PADS
• REFRESHING WIPES

OUR INGREDIENTS:

Cooling Herbal Blend

rosa damascena flower water, menthyl lactate, l-menthol, borneol, mentha arvensis (cornmint) leaf oil,
aloe barbadensis leaf juice, houttuynia cordata extract, lavandula angustifolia (lavender) oil

Pad Materials

100% certified organic cotton (top sheet), elemental chlorine-free natural wood pulp and
polypropylene (absorption), sodium polyacrylate (super absorbent core), calcium carbonate and
polyethylene (backsheet to prevent leakage), hot melt glue (adheres pad layers), polyethylene and
polyethylene terephthalate (nonwoven leak guard)

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20    21.    The Organic Cotton Cover Pads with Wings contain the following synthetic, non-
21  plant derived ingredients: Sodium polyacrylate, polyethylene, hotmelt glue, polyethylene
22  terephthalate.

23
24
25
26
27
28

CLASS ACTION COMPLAINT

**Sensitive Foaming Wash**




22.    The sensitive wash contains the following synthetic, non-plant derived ingredients: Cocamidopropyl Betaine, Tocopherol, Citric Acid, Potassium Sorbate, Sodium Benzoate, Pentylene Glycol, Propylene Glycol, Ethylhexylglycerin, Glycerin, Linalool, Limonene.

**Amber Sandalwood Foaming Wash**



23.     The Amber Sandalwood Foaming Wash contains the following synthetic, non-plant derived ingredients: Cocamidopropyl Betaine, Tocopherol, Citric Acid, Pentylene Glycol, Propylene Glycol, Ethylhexylglycerin, Glycerin, Linalool, Limonene.

1

**Cucumber Aloe Wash**

 

24.     The Cucumber Aloe Wash contains the following synthetic, non-plant derived ingredients: Cocamidopropyl Betaine, Tocopherol, Citric Acid, Pentylene Glycol, Propylene Glycol, Hydroxycitronellal, Amyl Cinnamal, Benzyl Benzoate, Linalool, Limonene, Ethylhexylglycerin, Glycerin, Linalool, Limonene.

1

**Bergamot Rose Foaming Wash**



25.     The Bergamont Rose Foaming Wash contains the following synthetic, non-plant derived ingredients: Cocamidopropyl Betaine, Tocopherol, Citric Acid, Potassium Sorbate, Pentylene Glycol, , Hydroxycitronellal, Ethylhexylglycerin, Glycerin, Linalool, Limonene.

1

**Normal Wash**



26.    The Normal Wash contains the following synthetic, non-plant derived ingredients: Cocamidopropyl Betaine, Tocopherol, Citric Acid, Potassium Sorbate, Sodium Benzoate, Pentylene Glycol, Propylene Glycol, Ethylhexylglycerin, Glycerin, Linalool, Limonene.

1

**Prebiotic Wash**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24




25    27.    The Prebiotic Wash contains the following synthetic, non-plant derived ingredients:

26    Cocamidopropyl Betaine, Tocopherol, Citric Acid, Potassium Sorbate,   Sodium Benzoate,

27    Pentylene Glycol, Propylene Glycol, Undecylenoyl Glycine,   Capryloyl Glycine, Trisodium

28    Ethylenediamine Disuccinate, Hydrogen peroxide, sodium hydroxide, Glycerin.

**Prebiotic Wipes**



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




CLASS ACTION COMPLAINT

28.     The Prebiotic Wipes contain the following synthetic, non-plant derived ingredients: Alpha-Glucan Oligosaccharide, Sodium Hydroxide, Citric Acid, Sodium Glycolate, Sodium Chloride, Glycol, Propylene Glycol, Ethylhexylglycerin, Glycerin.

**Normal Feminine Wipes**



29.    The Normal Feminine wipes contain the following synthetic, non-plant derived ingredients: Citric Acid, Sodium Chloride, Phenoxyethanol, Ethylhexylglycerin, Glycerin, Tocopheryl acetate.

**Amber Sandalwood Wipes**



30.     The Amber Sandalwood Wipes contain the following synthetic, non-plant derived ingredients: Citric Acid, Sodium Chloride, Phenoxyethanol, Ethylhexylglycerin, Glycerin.

1

**Bergamot Rose Wipes**



31.    The Bergamot Rose Wipes contain the following synthetic, non-plant derived

ingredients: Citric Acid, Sodium Chloride, Phenoxyethanol, Ethylhexylglycerin, Glycerin.

**Cucumber Aloe Wipes**



32.     The Cucumber Aloe Wipes contain the following synthetic, non-plant derived ingredients: Sodium Chloride, Citric Acid, Phenoxyethanol, Ethylhexylglycerin, Glycerin.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Sensitive Feminine Wipes**



33.     The Sensitive Feminine Wipes contain the following synthetic, non-plant derived ingredients: Sodium Chloride, Citric Acid, Phenoxyethanol, Ethylhexylglycerin, Glycerin.

**Organic Moisturizing Lubricant (Strawberry or Agave Flavor)**

 

34.    The Organic Moisturizing Lubricant contains the following synthetic, non-plant derived ingredient: Carrageenan.

1

**Anti-Itch Soothing Spray**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

 

16      35.    The Anti-Itch Soothing Spray contains the following synthetic, non-plant derived

17   ingredients: Glycerin, Pentylene Glycol, Benzoic Acid, Sodium Hydroxide, Potassium Sorbate,

18   Sodium Benzoate, Citric Acid.

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Sensitive Spray**



24      36.    The Sensitive Spray contains the following synthetic, non-plant derived

25  ingredients: PEG-40 Hydrogenated Castor Oil, Gluconolactone, Citric Acid, Tetrasodium

26  Glutamate Diacetate, Sodium Benzoate, Potassium Sorbate.

27
28

**Refreshing Spray**

(Amber Sandalwood, Cucumber Aloe, Lavender, Jasmine Frankincense)

 

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

 

21    37.    The Refreshing Spray contains the following synthetic, non-plant derived

22 ingredients: PEG-40 Hydrogenated Castor Oil, Citric Acid, Tetrasodium Glutamate Diacetate,

23 Sodium Benzoate, Potassium Sorbate.

24    38.    Despite the Plant-Derived Representations, each of the Products is full of synthetic,

25 non-plant-based, and/or highly processed ingredients. The Products contain numerous ingredients

26 that do not come from plants, as well as ingredients that were subjected to chemical modification

27 or processing, which materially altered the ingredients' original plant-derived composition.

28    39.    The following details the synthetic, non-plant-derived, and highly processed

ingredients within the Products, collectively referred to as "Non-Plant-Derived Ingredients" or "Synthetic Ingredients":

### C. Synthetic, Non-Plant Derived Ingredients in the Products

a. ***Alpha-Glucan Oligosaccharide*** – Chemical synthesis can be used to obtain alpha-glucan oligosaccharide. From a chemical perspective, the alpha-glucan oligosaccharide is a complex sugar or oligomer composed solely of glucose itself having a degree of polymerization of 2 - 10 units. Alpha and beta-glucans differ in the type of bond that links the molecules together. Like most sugars, alpha-glucan oligosaccharide is primarily extracted from plants, particularly from chicory roots. However, it can also be obtained through chemical synthesis.[9]

b. ***Sodium polyacrylate*** – Sodium polyacrylate is the sodium salt of polyacrylic acid. It is a super absorbent polymer that can absorb 100 to 1000 times its mass in water. Its sodium content enables it to absorb large amounts of water. It thickens the water-based formulations and finds applications in numerous consumer products like cosmetics and personal care products.[10]

c. ***PEG-40 Hydrogenated Castor Oil*** – is a polyethylene glycol derivative of hydrogenated castor oil, which is obtained through a chemical process. PEG-40 Hydrogenated Castor Oil is made by reacting synthetic polyethylene glycol with the hydrogenated castor oil. It is made in the labs by the means of ethoxylation, which means that 40 molecules of ethylene glycol are added to castor oil.[11]

d. ***Polyethylene*** – a common plastic mostly used for packaging – a thermoplastic polymer consisting of long hydrocarbon chains. It is the world's largest tonnage thermoplastic.[12]

e. ***Polyethylene terephthalate (PET)*** – a plastic polymer produced through the polymerization of ethylene glycol and terephtalic acid. PET waste has become a major portion of plastic pollution (Kim et al., 2020), and is a semicrystalline

---

[9] https://us.typology.com/library/what-is-alpha-glucan-oligosaccharide-and-what-is-its-utility

[10] https://cosmetics.specialchem.com/inci-ingredients/sodium-polyacrylate#:

[11] https://cosmetics.specialchem.com/inci-ingredients/peg-40-hydrogenated-castor-oil#

[12] https://www.sciencedirect.com/topics/materials-science/polyethylene

thermoplastic polyester. The bulk of the world's PET consumption is for synthetic polymers. PET is made up of a polymer matrix of ethylene terephthalate monomers with alternating (C10H8O4) units.[13]

f.  ***Hotmelt glue -*** Made of polymers, plasticisers, resins, waxes and oils and antixodiants. The polymers involved include ethylene vinyl acetate, thermoplastic rubber, metallocene, mPO, and amorphous poly alpha olefin – synthetic substances.[14]

g.  ***Carrageenan  -*** Industrial production of refined carrageenan consists of three main steps involving : (1) Extraction in alkaline conditions; (2) Purification by separating the gum from insoluble impurities; and (3) Carrageenan recovery (precipitation in alcohol or gelation of filtrate in presence of potassium chloride, drying then milling).[15] The process to manufacture carrageenan using "alkaline extraction" can produce "toxic substances" and is not environmentally friendly.[16] The industrial process  is shown below:



---

[13] https://www.sciencedirect.com/topics/earth-and-planetary-sciences/polyethylene-terephthalate

[14] https://www.beardowadams.com/news-and-blog/blog/what-is-hot-melt-glue-made-of

[15] https://www.cargill.com/food-bev/ap/carrageenans#

[16] Cruz-Solis, I., Ibarra-Herrera, C.C., Rocha-Pizaña, M.d.R., Luna-Vital, D. (2023). Alkaline Extraction–Isoelectric Precipitation of Plant Proteins. In: Hernández-Álvarez, A.J., Mondor, M., Nosworthy, M.G. (eds) Green Protein Processing Technologies from Plants. Springer, Cham. https://doi.org/10.1007/978-3-031-16968-7_1

CLASS ACTION COMPLAINT

h. **Cocamidopropyl Betaine** – a synthetic detergent made by processing coconut oil with dimethylaminopropylamine (a synthetic substance created by a reaction between dimethylamine and acrylonitrile). It was named "Allergen of the Year" in 2004.[17]

i. **Sodium Benzoate** – a synthetic preservative created by combining benzoic acid with sodium hydroxide (see below) – it does not occur naturally.[18]

j. **Benzoic Acid** – is synthetic.[19] Its first industrial synthesis was the hydrolysis of benzotrichloride to calcium benzoate, followed by acidification.[20] This method has been completely displaced by the air oxidation of toluene, which avoids the problem of product contamination with chlorinated byproducts.[21] The derivatives of benzoic acid are sodium benzoate, a salt used as a food preservative; benzyl benzoate, an ester used as a miticide; and benzoyl peroxide, used in bleaching flour and in initiating chemical reactions for preparing certain plastics.

k. **Pentylene Glycol** – Pentylene glycol (PG, synonym 1,2-pentanediol, C5H12O2) is a synthetic member of the 1,2-glycols used in cosmetics and pharmaceutical products.[22]

l. **Propylene Glycol** – a synthetic liquid substance that absorbs water, which is used to make polyester compounds.[23] Propylene glycol is used by the chemical, food, and pharmaceutical industries as an antifreeze when leakage might lead to contact with food. It is a solvent for food colors and flavors, and in the paint and plastics industries. Propylene glycol is also used to create artificial smoke or fog used in fire-fighting training and in theatrical productions. Other names for propylene glycol are 1,2-dihydroxypropane, 1,2-propanediol, methyl glycol, and trimethyl glycol. Propylene glycol is known to exert high levels of biochemical oxygen demand (BOD) during degradation in surface waters. This process can adversely affect aquatic life by consuming oxygen needed by aquatic organisms for

---

[17] https://pubmed.ncbi.nlm.nih.gov/18627690/

[18] https://www.healthline.com/nutrition/sodium-benzoate#what-it-is

[19] https://www.acs.org/molecule-of-the-week/archive/b/benzoic-acid.html#

[20] *Id.*

[21] *Id.*

[22] https://www.sciencedirect.com/science/article/abs/pii/S0273230017301228

[23] https://pubchem.ncbi.nlm.nih.gov/compound/Propylene-Glycol

CLASS ACTION COMPLAINT

survival.[24]

m. ***Capryloyl Glycine*** - Capryloyl Glycine is an acylation product of glycine with caprylic acid chloride.[25] It is synthesized through a complicated chemical process that combines glycine with caprylic acid – which results in capryloyl glycine which is further processed, purified and formulated before making its way into the Products.

n. ***Tetrasodium Glutamate Diacetate*** – is a salt synthesized from glutamic acid. Production is conducted through a continuous reactor. The process includes the following steps:  (1) a sodium glutamate saline solution, a sodium cyanide solution and a formaldehyde solution are used as raw materials and fed into a first reaction kettle to react through a heat exchange system according to the flow speed, and generated ammonia gas is collected at the same time; (2) feed liquid generated after reaction in the first reaction kettle is discharged from the bottom of the kettle and directly enters a second reaction kettle to continue to react, and ammonia gas generated in the second reaction kettle is collected at the same time; (3) feed liquid reacting in the second reaction kettle is discharged from the bottom of the kettle and enters a storage tank to be subjected to decoloration, filtration and concentration regulation so that a tetrasodium glutamate diacetate solution can be obtained.[26]

o. ***Trisodium Ethylenediamine Disuccinate*** - Trisodium ethylenediamine disuccinate is synthesized from ethylenediamine, sodium hydroxide, and succinic acid. The reaction involves the condensation of ethylenediamine and succinic acid, followed by the addition of sodium hydroxide to form the trisodium salt. The resulting compound is then purified to produce the final product.[27]

p. ***Tocopheryl acetate*** – can be either natural or synthetic, depending on its chemical structure. The natural form of tocopheryl acetate is D-alpha tocopherol acetate, while the synthetic form is DL-alpha tocopherol acetate. The "D-" indicates the natural form, while the "DL-" indicates the synthetic form, Defendant does not disclose which form it is indicating that it is the synthetic form.

q. ***Hydrogen peroxide*** – hydrogen peroxide is made with hydrogenation of a palladium catalyst, which creates a reaction between hydrogen and

---

[24] https://cumberlandrivercompact.org/problem/propylene-glycol/#:

[25] https://www.ewg.org/skindeep/ingredients/701065-CAPRYLOYL_GLYCINE/

[26] https://patents.google.com/patent/CN105732408A/en

[27] https://cosmetics.specialchem.com/inci-ingredients/trisodium-ethylenediamine-disuccinate

anthrahydroquinone. The palladium is then filtered out and oxidation takes place. This creates the hydrogen peroxide. [28]

r.   **Amyl Cinnamal –** is synthesized from benzaldehyde and n- heptanal by aldol condensation with catalyst potassium hydroxide in solvent ethylene glycol.[29] Amyl cinnamal is a synthetically produced scent ingredient and has been associated with allergies and contact dermatitis.[30]

s.   **Benzyl Benzoate -** Benzyl benzoate is synthesized from the gasified mixture of benzoic acid and toluene in the effects of catalyst and water.[31] Three main methods were used for preparation of benzyl benzoate: (1) esterification of benzoic acid with benzylalcohol, (2) transposition between sodium benzoate and benzylchloride, and (3) condensation of two molecules of benzaldehyde in the presence of sodium hydroxide. Benzyl benzoate is rapidly hydrolyzed in vivo to benzoic acid and benzylalcohol. Benzylalcohol in turn is oxidized to benzoic acid, which is then conjugated with glycine to form hippuric acid.[32]

t.   **Citric Acid –** Defendants use artificial manufactured citric acid in the Products. Commercial food manufactures use a synthetic form of citric acid that is derived from heavy chemical processing.[33] Citric acid is manufactured using a type of black mold called *Aspergillus niger* which is modified to increase citric acid production.[34] Consumption of manufactured citric acid has been associated with adverse health events like joint pain with swelling and stiffness, muscular and stomach pain, as well as shortness of breath.[35] "Approximately 99% of the world's production of

---

[28] https://www.chemicals.co.uk/blog/how-hydrogen-peroxide-made

[29] https://foreverest.net/products/extractives-synthetic/amylcinnamaldehyde-cas-122-40-7.html#:

[30] https://www.ewg.org/skindeep/ingredients/700401-AMYLCINNAMALDEHYDE/

[31] https://patents.google.com/patent/CN102557944B/

[32] https://www.sciencedirect.com/science/article/abs/pii/S0099542808606383#

[33] A. Hesham, Y. Mostafa & L. Al-Sharqi, *Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates*, 48 MYCOBIOLOGY 122, 123 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/

[34] *Id*; Pau Loke Show, *et al.*, *Overview of citric acid production from Aspergillus niger*, FRONTIERS IN LIFE SCIENCE, 8:3, 271-283 (2015), *available at* https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653

[35] Iliana E. Sweis, *et al.*, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports,* TOXICOL REP. 5:808-812 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

[citric acid] is carried out using the fungus *Aspergillus niger* since 1919." [36] As explained by a study published in the *Toxicology Reports Journal*: Citric acid naturally exists in fruits and vegetables. However, **it is *not* the naturally occurring citric acid, but the manufactured citric acid (MCA) that is used extensively as a food and beverage additive**. *Aspergilus niger* is a known allergen.[37]

u. ***Ethylhexylglycerin -*** is a synthetic ingredient created by a condensation reaction between two different chemicals.[38]

v. ***Glycerin*** – also known as Glycerol is a solvent for inorganic compounds. Glycerol by itself can be a suitable substitute for various polyols, such as glycols, trimethylolpropane, sorbitol (e.g., in toothpaste, mouthwash, food, and pharmaceuticals), and pentaerythritol (e.g., alkyd resins). Often, it is the relative price of these different polyols that determines which one gets used in a specific application. Glycerol is a C3 polymer building block and has become an attractive raw material for the synthesis of some very useful industrial chemicals.[39] The term glycerol often denotes the pure compound while the term glycerin refers to the commercial products containing >95% glycerol.

w. ***Limonene -*** is chemically synthesized for fragrance formulations. In chemical synthesis, limonene can be produced as either R-limonene or S-limonene, or as a mixture of enantiomers. The Limonene in the Products is chemically altered and/or processed the ingredient such that the resulting ingredient used in the Products is synthetic. [40]

x. ***Linalool -*** a synthetic aroma ingredient. Linalool comes as clear, colorless liquid.[41]

y. ***Phenoxyethanol*** – is produced by the hydroxyethylation of phenol (Williamson synthesis) and is a "chemical preservative."[42] The FDA has warned that the chemical is toxic to infants via ingestion and can depress the central nervous system and may cause vomiting and diarrhea.[43] The EPA data sheets show chromosomal

---

[36] *Id*.

[37] *Id*. (emphasis added)

[38] https://www.paulaschoice.com/ingredient-dictionary/miscellaneous/ethylhexylglycerin.html

[39] https://www.sciencedirect.com/topics/agricultural-and-biological-sciences/glycerol#:

[40] https://www.researchgate.net/publication/355154982_Limonene_Emissions_Do_Different_Types_Have_Different_Biological_Effects

[41] https://healthis-choice.com/ms/qa/page=872367aa094510a796bb62e5ca353fbf_qa

[42] https://www.atamanchemicals.com/phenoxethanol_u28981/

[43] *Id*.

CLASS ACTION COMPLAINT

changes and genetic mutation effect in testing as well as testicular atrophy and interference with reproductivity in mice.[44]

z. **Potassium Sorbate** is made synthetically. Sorbic acid is blended with potassium hydroxide in equimolar portions and recrystallized with aqueous ethylene hydroxide to form potassium sorbate.[45]

aa. **Sodium hydroxide** – an inorganic base that is listed as being "synthetic" under 7 C.F.R. § 205.605. According to 7 U.S.C. § 6502 (21), "synthetic" means "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources[.]" A byproduct of its production is chlorine gas.[46]

bb. **Sodium chloride –** commonly known as salt. The EPA says sodium chloride is manufactured by conventional underground mining, solution-mining of an underground salt deposit, or evaporation of seawater or brine – nothing to do with plants. [47]

cc. **Tocopherol** – The Tocopherol in the Products is synthetic alpha-tocopherol, which is often made from petrochemicals. The synthetic form is racemic, an even mixture of stereoisomers, referred to as dl-alpha-tocopherol.[48]

**D. Defendant Mislead Plaintiffs and Reasonable Consumers who Relied on the Material and False Advertising Claims to Their Detriment**

40.    The "Plant-derived" claims are material to reasonable consumers, including Plaintiffs, in deciding to purchase the Products. A recent survey of over 1,000 adults conducted by the Trust Transparency Center concluded that Americans favor "natural" products over synthetically processed products and think synthetic products should be specifically labeled as

---

[44] *Id.*

[45] https://www.ams.usda.gov/sites/default/files/media/P%20Sor%20technical%20advisory%20panel%20report.pdf

[46] https://www.ewg.org/skindeep/ingredients/706075-SODIUM_HYDROXIDE/

[47] https://www.epa.gov/system/files/documents/2023-03/Sodium%20Chloride%20Supply%20Chain%20Profile.pdf

[48] https://www.betalabservices.com/natural-or-synthetic-vitamin-e/

"synthetic."[49] In fact, the results of the survey were so compelling that the founder of the Trust Transparency Center observed that "Consumers expect brands to be transparent with their materials and the results of this survey support that consumers want to know if the product they're buying is derived from synthetic material." Instead of disclosing that the Products contain synthetic materials, Defendant affirmatively claims that they are natural, i.e., "plant-derived."

41.      Greenwashing is a marketing strategy designed to hoodwink consumers into believing they are buying natural and eco-friendly products while, in fact, they are not. Greenwashing drives sales and is designed to gain a competitive advantage over genuine natural products which are more expensive. Greenwashing harms both consumers and the environment by spreading misinformation and diminishing consumer trust in truly eco-friendly brands. Here, Defendant is greenwashing its Products.

42.      Accordingly, Plaintiffs and reasonable consumers relied and continue to rely on Defendant's "plant-derived" claims in making the decision to purchase the Products.

43.      At the time Plaintiffs and reasonable consumers purchased the Products, they did not know, and had no reason to know, that the Products' Plant-Derived Representations on the label were false, misleading, deceptive, and unlawful as set forth herein. Consumers do not scour the ingredient list, then consult with scientific experts in order to determine whether the "plant-derived" claims are deceptive or truthful.

44.      Defendant knew that the Plant-Derived Representations were deceptive at the time that they advertised the Products and thoughtfully placed the Plant-Derived Representations on the Products' labeling and packaging. Defendant knows that the Products contain synthetically manufactured ingredients since it sourced/purchased the ingredients from chemical suppliers.

45.      Plaintiffs and reasonable consumers would not have purchased the Products, or would have paid less, if they had known the truth—that the Plant-Derived Representations are not

---

[49]      Traci Kantowski, TRUST TRANSPARENCY CTR., *New Survey Finds Consumers Skeptical of Synthetic Dietary Supplements; Favor Labeling on All Synthetic Vitamins and Supplements* (Sept. 5, 2018), *available at* https://trusttransparency.com/new-survey-finds-consumers-skeptical-of-synthetic-dietary-supplements-favor-labeling-on-all-synthetic-vitamins-and-supplements/ (last visited Nov. 23, 2022).

true because the Products contain synthetic ingredients. Accordingly, based on Defendant's material misrepresentations, reasonable consumers, including Plaintiffs, purchased the Products to their detriment.

**D. The Products are Substantially Similar**

46. The Products Plaintiffs purchased are substantially similar to all Products. All Products are manufactured, sold, marketed, advertised, labeled, and packaged by Defendant. All Products are sold under the same brand name – The Honey Pot – a brand marketed as selling plant-derived products with plant-derived ingredients.[50] All the Products are feminine care products. All Products are labeled as "plant-derived" on the front of the packaging but contain synthetic ingredients. All Products are marketed directly to women for personal use. The misleading effect of the Products' labels is the same for all products.

**E. No Adequate Remedy at Law**

47. Plaintiffs have no adequate remedy at law for the claims based on California Law. The UCL provides broader remedies and injunctive relief for which monetary damages are not adequate. Equitable remedies (like injunctions) achieve a better outcome, particularly when simple monetary restitution fails to address the broader implications of the wrongdoing.

## V.    CLASS ACTION ALLEGATIONS

48. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seeks certification of the following Classes:

**The California Class**
All persons in California who purchased the Products for personal use until the date class notice is disseminated.

**The New York Class**
All persons in New York who purchased the Products for personal use until the date class notice is disseminated.

**The Nationwide Class**
All persons in the United States who purchased the Products for personal use until the date class notice is disseminated.

---

[50] https://thehoneypot.co/pages/our-story. Last visited on September 25, 2024.

49.    Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; and (iv) those that received a full refund for the Products they purchased.

50.    The Classes described in this complaint will jointly be referred to as the "Class" or the "Classes" unless otherwise stated, and the proposed members of the Classes will jointly be referred to as "Class Members."

51.    Plaintiffs and the Class reserve their right to amend or modify the Class definitions with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

52.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable. Due to the nature of the trade and commerce involved, however, Plaintiffs believe the total number of Class members is at least in the hundreds and members of the Classes are numerous. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery. The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

53.    Pursuant to Rule 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief and damages as to the Products appropriate with respect to the Classes as a whole. In particular, Defendant has failed to disclose the true nature of the Products being marketed as described herein.

54.    There is a well-defined community of interest in the questions of law and fact involved, affecting the Plaintiff and the Classes and these common questions of fact and law include, but are not limited to, the following:

- Whether Defendant's conduct constitutes an unfair method of competition or unfair or deceptive act or practice, in violation of California Civil Code § 1750, *et seq.* and New York General Business Law §§ 349 and 350;

- Whether Defendant used deceptive representations in connection with the sale of the Products is in violation California Civil Code § 1750, *et seq.* and New York General Business Law §§ 349 and 350;

- Whether Defendant represented that the Products have characteristics or quantities that they do not have in violation of California Civil Code § 1750, *et seq.*;

- Whether Defendant advertised the Product with intent not to sell them as advertised in violation of California Civil Code § 1750, *et seq.*;

- Whether Defendant's labeling and advertising of the Products are untrue or misleading in violation of California Business and Professions Code § 17500, *et seq.* and New York General Business Law §§ 349 and 350;

- Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of California Business and Professions Code § 17500, *et seq.*;

- Whether Defendant's conduct is a fraudulent business practice within the meaning of California Business and Professions Code § 17200, *et seq.* and New York General Business Law §§ 349 and 350;

- Whether Defendant's conduct is an unlawful business practice within the meaning of California Business and Professions Code § 17200, *et seq.*;

- Whether Defendant's conduct constitutes breach of express warranties;

- Whether Plaintiffs and the Class are entitled to injunctive relief; and

- Whether Defendant was unjustly enriched by its unlawful conduct.

55.     These common questions of law and fact predominate over questions that affect only individual Class Members.

56.     Plaintiffs' claims are typical of Class Members' claims because Plaintiffs, like the Class Members, purchased Defendant's misleading and deceptive Products. Defendant's unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries

arising out of Defendant's conduct. Plaintiffs' and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

57. Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel with substantial experience in handling complex consumer class action litigation. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so.

58. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable.

59. Because Plaintiffs seek relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

60. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Violations of the Unfair Competition Law ("UCL")

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

### *(on behalf of the California Class)*

61. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

62. This cause of action is brought pursuant to California Business and Professions Code Section 17200, *et seq.*, on behalf of Plaintiff Tucker and a California Class who purchased the Products within the applicable statute of limitations.

63. Defendant, in their advertising and packaging of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products, specifically, labeling the Products with the Plant-Derived Representations despite the Products containing numerous ingredients that do not come from plants as well as ingredients that, through chemical processing and modification, have been materially altered from their original plant-based composition. Such claims and omissions appear (or fail to appear) on the labeling and packaging of the Products, which are sold at retail stores and online.

64. Defendant's labeling and advertising of the Products led—and continues to lead—reasonable consumers, including Plaintiff Tucker, to believe that the Products only contain ingredients that come from plants and that were not subjected to chemical modification or processing which materially altered the ingredients' original plant-based composition, and/or that are not synthetic. As such, reasonable consumers, including Plaintiff Tucker, believe the Products only contain plant based or 100% vegetarian ingredients.

65. Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to California Business & Professions Code sections 17200, *et seq*. (the "UCL").

66. California's Unfair Competition Law, California Business & Professions Code §17200 prohibits any "unfair, deceptive, untrue or misleading advertising." For the reasons discussed above, Defendant has engaged in unfair, deceptive, untrue and misleading advertising, and continues to engage in such business conduct, in violation of the UCL.

67. California's UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

68. In addition, Defendant's use of various forms of media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business & Professions Code sections 17200 and 17531, which

advertisements have deceived and are likely to deceive the consuming public, in violation of Business & Professions Code Section 17200.

69.    Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

70.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice, and/or generalized course of conduct, which will continue on a daily basis until Defendant voluntarily alters its conduct or is otherwise ordered to do so.

71.    Pursuant to Business & Professions Code sections 17203 and 17535, Plaintiff Tucker and the members of the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practices of labeling and advertising the sale and use of the Products. Likewise, Plaintiff Tucker and the members of the California Class seek an order requiring Defendant to disclose such misrepresentations, and to preclude Defendant's failure to disclose the existence and significance of said misrepresentations.

72.    Plaintiff Tucker and the California Class have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendant's false representations.

73.    Plaintiff Tucker and the California Class would not have purchased the Products but for the Plant-Derived Representations.

74.    Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law.

75.    Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving.

76.    Defendant willfully and knowingly disregarded the rights of Plaintiff Tucker and consumers as Defendant was, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff Tucker.

77.    Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise

would despise such corporate misconduct. Said misconduct subjected Plaintiff Tucker and consumers to cruel and unjust hardship in knowing disregard of their rights.

78.    Defendant's misconduct is fraudulent as Defendant intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff Tucker and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## Unfair Prong

79.    Under California's Unfair Competition Law, Cal. Bus. & Prof. Code section 17200 *et seq.*, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal.App.4th 1394, 1403 (2006).

80.    Defendant's action of mislabeling the Products with the Plant-Derived Representations does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive.

81.    Consumers cannot avoid any of the injuries caused by Defendant's deceptive labeling and/or advertising of the Products.

82.    Accordingly, the injuries caused by Defendant's deceptive labeling and/or advertising do not outweigh any benefits.

83.    Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business & Professions Code section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada*, N.A., 691 F.3d 1152, 1169 (9th Cir. 2012).

84.    Here, Defendant's conduct of labeling the Products with the Plant-Derived Representations has no utility and financially harms purchasers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of harm.

CLASS ACTION COMPLAINT

85.    Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

86.    Defendant's labeling and advertising of the Products, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct.

87.    Defendant knew or should have known of its unfair conduct.

88.    As alleged above, Defendant's misrepresentations constitute an unfair business practice within the meaning of California Business & Professions Code section 17200.

89.    There existed reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Plant-Derived Representations.

90.    All of the conduct alleged herein occurs and constitutes to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

91.    Pursuant to Business and Professions Code section 17203, Plaintiff Tucker and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practices of labeling the Products with the Plant-Derived Representations.

92.    Plaintiff Tucker and the California Class have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff Tucker and the California Class paid an unwarranted premium for the Products. Specifically, Plaintiff Tucker and the California Class paid for Products that contained ingredients that are non-natural, synthetic, and/or highly processed. Plaintiff Tucker and the California Class would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff Tucker seeks damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

### **Fraudulent Prong**

93.    California Business & Professions Code section 17200, *et seq.,* considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Cour*t, 2 Cal. 4th 1254, 1267 (1992).

94.     Defendant's conduct of mislabeling the Products with the Plant-Derived Representations is likely to deceive members of the public and is false, deceptive, misleading, and unreasonable, and constitutes fraudulent conduct.

95.     Defendant knew or should have known of its fraudulent conduct.

96.     As alleged herein, Defendant's misrepresentations constitute a fraudulent business practice in violation of California Business & Professions Code section 17200.

97.     Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with Plant-Derived Representations.

98.     All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

99.     Pursuant to Business & Professions Code section 17203, Plaintiff Tucker and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products with Plant-Derived Representations.

100.    Plaintiff Tucker and the California Class have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiff Tucker paid an unwarranted premium for the Products and seeks restitution of the premium or the full price paid for the Products. Specifically, Plaintiff Tucker and the California Class paid for products that they believed only contain ingredients that are derived from plants, and that were not synthetic or derived from animal materials.

101.    Plaintiff Tucker and the California Class would not have purchased the Products if they had known that the Plant-Derived Representations were false. Accordingly, Plaintiff Tucker seeks disgorgement of ill-gotten gains pursuant to the UCL.

### **Unlawful Prong**

102.    California Business & Professions Code sections 17200, *et seq*., identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable*." Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

103.    Here, Defendant's labeling and advertising of the Products, as alleged herein, violates California Civil Code Section 1750, *et seq*. and California Business & Professions Code sections 17500, *et seq*.

104.    Defendant's packaging labeling, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct.

105.    Defendant knew or should have known of its unlawful conduct.

106.    As alleged herein, Defendant's misrepresentations constitute an unlawful business practice within the meaning of California Business & Professions Code section 17200.

107.    Additionally, Defendant's misrepresentations of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

108.    Defendant's conduct in making the representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent, and/or unlawful business practice under California Business & Professions Code sections 17200-17208.

109.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein. Defendant could have refrained from making the Plant-Derived Representations and/or omitting that the Products contained ingredients that are not plant based, chemically modified, and/or highly processed.

110.    All of the conduct occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is a pattern or generalized course of conduct.

111.    Pursuant to Business & Professions Code section 17203, Plaintiff Tucker and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive labeling and advertising of the Products.

112.    Plaintiff Tucker and the California Class have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiff Tucker and the California Class paid

an unwarranted premium for the Products. Plaintiff Tucker and the California Class would not have purchased the Products if they had known that the Plant-Derived Representations were untrue. Accordingly, Plaintiff Tucker seeks disgorgement of ill-gotten gains pursuant to the UCL.

<u>**SECOND CAUSE OF ACTION**</u>

**Violations of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code §§ 1750 *et seq.***

***(on behalf the California Class)***

113.    Plaintiffs reallege and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

114.    Plaintiff Tucker brings this claim individually and on behalf of the California Class who purchased the Products within the applicable statute of limitations.

115.    Plaintiff Tucker brings this action pursuant to the CLRA, codified at Cal. Civ. Code §§ 1750, *et seq.*

116.    The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

117.    The Products are "goods," as defined by the CLRA in California Civil Code §1761(a).

118.    Plaintiff Tucker and members of the California Class are "consumers," as defined by the CLRA in California Civil Code §1761(d).

119.    Purchase of the Products by Plaintiff Tucker and members of the California Class are "transactions," as defined by the CLRA in California Civil Code §1761(e).

120.    Defendant violated Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have" in that the Products are falsely labeled and advertised, as described herein. Defendant knew that consumers will pay more for products with the Plant-Derived Representations and have unfairly profited from the false and misleading representations.

121.    Similarly, Defendant violated section 1770(a)(7) by representing that the Products

"are of a particular standard, quality, or grade . . . if they are of another" by falsely and deceptively labeling and advertising the Products, as described herein.

122.    In addition, Defendant violated section 1770(a)(16) by representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, as described herein.

123.    Defendant's uniform and material representations regarding the Products were likely to deceive, and Defendant knew or should have known that its representations and omissions were untrue and misleading.

124.    Plaintiff Tucker and members of the California Class could not have reasonably avoided such injury. Plaintiff Tucker and members of the California Class were unaware of the existence of the facts that Defendant hid and failed to disclose, and Plaintiff Tucker and members of the California Class would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

125.    Plaintiff Tucker and members of the California Class have been directly and proximately injured by Defendant's conduct. Such injury includes, but is not limited to, the purchase price of the Products and/or the portion of the price paid for the misrepresented attributes of the Products.

126.    Given that Defendant's conduct violated section 1770(a), Plaintiff Tucker and members of the California Class are entitled to injunctive relief to put an end to Defendant's violations of the CLRA.

127.    Moreover, Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers to increase the sale of the Products.

128.    Pursuant to California Civil Code section 1782, Plaintiffs will notify Defendant in writing by certified mail of the alleged violations of the CLRA and demand that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. If Defendant fails to rectify or does not agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days

of the date of written notice pursuant to section 1782 of the CLRA, then Plaintiffs will amend this complaint to seek damages under the CLRA.

129.   Plaintiff Tucker requests that the Court enjoin Defendant from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to section 1780(a)(2), and otherwise require Defendant to take corrective action necessary to dispel the public misperception engendered, fostered, and facilitated through Defendant's false Plant-Derived Representations.

130.   The primary goal of this action is to halt Defendant's deceptive "Plant-Derived" labeling and advertising.

### THIRD CAUSE OF ACTION

**Violations of New York General Business Law ("GBL") § 349**

(*on behalf of the New York Class*)

131.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

132.   Plaintiff Rabinowitz brings this claim individually and on behalf of the New York Class who purchased the Products within the applicable statute of limitations.

133.   New York's General Business Law section 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce in the State of New York.

134.   In the sale of the Products throughout the State of New York, Defendant conducted business and trade within the meaning and intendment of New York's General Business Law section 349.

135.   Plaintiff Rabinowitz and the New York Class members are consumers who purchased the Products from Defendant for their personal use.

136.   By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices by conspicuously representing on the packaging of the Products the Plant-Derived Representation. Despite the Plant-Derived Representation, however, the Products contain synthetic ingredients.

137.   The foregoing deceptive acts and practices were directed at consumers.

138.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the nature and value of the Products.

139.    As a result of Defendant's deceptive practices, Plaintiff Rabinowitz and the New York Class members suffered an economic injury because they would not have purchased or would have paid less for the Products had they known the veracity of Defendant's misrepresentations.

140.    On behalf of herself and the New York Class members, Plaintiff Rabinowitz seeks to recover actual damages or fifty dollars per unlawful transaction (i.e., for each sale of the Products), whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Violation of New York General Business Law ("GBL") § 350

### *(on behalf of the New York Class)*

141.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

142.    Plaintiff Rabinowitz brings this claim individually and on behalf of the New York Class who purchased the Products within the applicable statute of limitations.

143.    New York's General Business Law section 350 prohibits false advertising in the conduct of any business, trade, or commerce in the State of New York.

144.    Defendant violated New York General Business Law section 350 by representing on the packaging of the Products the Plant-Derived Representation. Despite the Plant-Derived Representation, however, the Products contain synthetic ingredients. This is false advertising under the GBL.

145.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

146.    Defendant's misrepresentations have resulted in an unlawful taking of money from consumers.

CLASS ACTION COMPLAINT

147.    As a result of Defendant's false advertising, Plaintiff Rabinowitz and the New York Class members suffered an economic injury because they would not have purchased or would have paid less for the Products had they known the truth of Defendant's misrepresentations.

148.    On behalf of herself and the New York Class members, Plaintiff Rabinowitz seeks actual damages or five hundred dollars per unlawful transaction (i.e., for each sale of the Products), whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Breach of Express Warranty

***(on behalf of the Nationwide Class, the California Class, and the New York Class)***

149.    Plaintiffs reallege and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

150.    Plaintiffs bring this claim for breach of express warranty individually and on behalf of the Classes against Defendant.

151.    As the manufacturer, marketer, distributor, and seller of the Products, Defendant issued an express warranty by representing to consumers at the point of purchase that the Products are "Plant-Derived."

152.    Plaintiffs and the Class reasonably relied on Defendant's misrepresentations, descriptions and specifications regarding the Products, including the representation that the Products are truly "Plant-Derived" and do not contain synthetics.

153.    Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiffs and Members of the Class.

154.    In fact, the Products do not conform to Defendant's representations because the Products contain synthetic and non-plant derived ingredients. By falsely representing the Products in this way, Defendant breached express warranties.

155.    Plaintiffs relied on Defendant's (the manufacturer) representations on the Products' labels and advertising materials which provide the basis for an express warranty under New York, California, and laws of the United States.

156.   As a direct and proximate result of Defendant's breach, Plaintiffs and Members of the Classes were injured because they: (1) paid money for the Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about the characteristics of the Products were truthful.

157.   Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiffs and Class Members would not have purchased the Products or would not have paid as much as they did for them.

## VI.   **REQUEST FOR RELIEF**

158.   Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

- For an order certifying this action as a class action;
- For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;
- For an order requiring Defendant to immediately cease and desist from selling unlawful Products; enjoining Defendant from continuing to market, advertise, distribute and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;
- For an order awarding restitution, monetary damages, statutory damages, and/or disgorgement of wrongful profits consistent with applicable law;
- For an order awarding pre-and-post judgment interest;
- For an order awarding attorneys' fees and costs;
- For an order awarding punitive damages; and
- For such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all claims in this Complaint.

Date: November 12, 2024

CROSNER LEGAL, P.C.

By: ___/s/ Craig W. Straub_____
        CRAIG W. STRAUB

Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Jennifer L. MacPherson (SBN 202021)
jmacpherson@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

*Attorneys for Plaintiffs*

<u>California Civil Code Section 1780(d) Affidavit</u>

I am an attorney duly licensed to practice before all courts of the State of California. I am one of the counsel of record for Plaintiffs. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act. Defendants have done, and are doing, business in California, including in this district. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed November 12, 2024 at San Diego, California.

By:    */s/ Craig W. Straub*
                    CRAIG W. STRAUB

CLASS ACTION COMPLAINT